LOTTINGER, Judge.
This case was instituted by the plaintiff, Peter Delatte, in the lower court for compensation under the 'Louisiana Employers’ Liability Act, Act No. 20 of 1914, as amended, for an injury, sustained in the employ ' of defendant, Leo Cafiero, Inc., on August 7, 1948. American Mutual Liability Insurance Company, defendant’s insurer, was likewise made' a party defendant. The lower court rejected the demands'of plaintiff and rendered judgment in favor of the defendants and the plaintiff has appealed.
The plaintiff claims that prior to and on August 7, 1948, he was employed as a machinist by the defendant corporation and on said date, while performing the duties assigned to him by his employer, in a machine shop operated by said defendant, and while in the discharge of his duties, he received an injury to-his right foot, which practically severed the achilles tendon of said foot. He claims further that on or about September 8, 1948, he suffered a tear of said tendon and was again placed in the hospital and was released on October 11. That subsequent to his release from the hospital, he resumed his 'work with defendant, but on account of the shortage of said achilles tendon and the fact that he is no longer able to support the weight of his body on the ball of his foot as required in the discharge of his labors in th,e performance of his duties, he suffers considerable pain, which results in the slowing down of his work to such an extent that he is unable to discharge his duties without- hazard to himself and his fellow employees, and that on January 3, 1949, he was discharged by his employer as being unfit and unable to perform his' customary and his usual occupations. -He claims that he is permanently disabled and unable to perform and discharge the work he was accustomed to do prior to his accident and is therefore entitled to recover total disability at the rate of $30 per week for a -period of 400 weeks. He admits-.that he was paid 10 weeks’ compensation at $30 per week. The answer admits the employment and is in the náture of a general denial; and the defendant further sets up such defense that the plaintiff was cured, that he returned to work and was able to do his work but that he was discharged for insubordination.
The evidence reveals the fact that the defendant is in the general contracting business, doing hauling and machine shop work and that the plaintiff was an employee of said defendant as a machinist and that he had been employed since 1945, and that at the time of the accident, he was rated as a second class machinist, and -that on August 7, 1948, while the plaintiff was performing his duties, he received an injury to the achilles tendon of the right foot. He was immediately brought to the hospital of Dr. Percy LeBlanc, and Dr. LeBlanc operated on him and that on the same day he was sent home with crutches. Dr. Le-Blanc treated plaintiff until October 11, at which time he was discharged by Dr. Le-Blanc and pronounced as able to return to work. The evidence further reveals the fact that on October 3, .plaintiff returned to defendant corporation to work for a trial period and worked ■ until. October 7, and resumed continuous work on October 11, until January 3, at which time he was discharged by defendant.
• Plaintiff testified that he labored under great difficulty due to pain and swelling of the lower portion of his right leg. He, as well as his wife, testified that when he *708 would return at home at night after work, that he would have to soak his foot in hot Epsom salt water and that he could not go out and play ball with the children as he had previously been accustomed' to doing. There is also testimony by a friend of the plaintiff that when he went hunting with the plaintiff, that the plaintiff only hunted on the highland and that he would make this friend of his go out in the bushes and do the hard work in the hunting, plaintiff claiming that he could not do this extra hard work in hunting. The evidence discloses that the plaintiff was a second class machinist and that he was only assigned certain kinds of work to do because of the fact that he was not proficient or capable of doing other or more skillful work. It appears that ■ the. defendant ■ likewise gave its employees overtime work to dó and gave plaintiff,’ as well as- other employees, overtime. Plaintiff worked until the Christmas Holidays and on January 3, when plaintiff returned to defendant to resume work, he complained to Mr. Pier-man Cañero, the general manager, that he was not satisfied with the hours he was making and that defendant had a boy by the name of Claude Campo, a single man, making more hours than he was and that he thought that since he was married he should be entitled to more time than he had -been making. He complained also that he was not satisfied with the way his foreman gave him work and he was informed by the general manager that the foreman ran the shop, however, the foreman was doing a good job, and if he was not satisfied with the way the foreman went about it he could look for a job some place else and -at that time, the plaintiff went to raging a bit and after he and the general manager argued for a while, the general manager fired him. This is all testified to by the general manager and that is the reason the general manager gave for discharging him. The evidence discloses that plaintiff’s work prior to his injury was not a bit better than his work after the injury and that they were satisfied with his work, but always had some work that he was more capable of doing, that is, the more simple jobs. The evidence discloses the fact of the work record, that is, the number of hours worked by plaintiff prior to and subsequent to the accident which is as follows:
1. Number of work hours plaintiff worked for the weeks ending July 1, 1948, through August 12, 1948.
Week ending 7-1-48 40 hours
Week ending 7-8-48 43 hours
Week ending 7-15-48 45j/^ hours
Week ending 7-22-48 45 hours
Week ending 7-29-48 45 hours
Week ending 8-5-48 55^i hours
Week ending 8-12-48 18 hours
2. Number of work hours plaintiff worked for the weeks ending October 7, 1948, through December 30, 1948. Week ending 10-7-48 36 hours
Week ending 10-14-48 46 hours Week ending 10-21-48 5114 hours Week ending 10-28-48 72 hours Week ending 11-4-48 52}4 hours Week ending. 11-11-48 59 hours Week ending 11.-18-48 41^ hours Week ending 11-25-48 42t/z hours Week ending 12-2-48. 48 hours Week ending 12^8-48 52 hours Week ending 12-16-48 40 hours Week ending 12-22-48 40 hours Week ending 12-30-48 8 hours
3. Number of hours of overtime work plaintiff did prior to the accident. Week ending 3-4-48 10l/¡> hours
Week ending 3-18-48 1 hour
Week ending 3-25-48 2 hours
Week ending 4-15-48 14 hour
Week ending 4-22-48 1 hour
Week ending 4-29-48 1/2 hour
Week ending 6-3-48 t/z hour
Week ending 6-17-48 1 hour
Week ending 6-24-48 4Yz hours
4. Number of hours of overtime work subsequent to the accident.
Week ending 10-4-48 6 hours
Week ending 10-21-48 11J4 hours
Week ending 10-28-48 32 hours
Week ending 11-4-48 12t/z hours
Week ending 11-11-48 19 hours
Week ending 11-18-48 lt/2 hours
Week ending .11-25-48 2t/z hours
Week ending 12-2-48 8 hours
Week ending 12-9-48 12 hours
*709 The above discloses that the plaintiff worked approximately the same number of hours subsequent to the accident as he had prior to the accident. The testimony of the employees of defendant likewise reveal the fact that they could see no difference in the work of the plaintiff either prior or subsequent to the accident, and that the plaintiff did not complain to them of any pain in his right foot or leg.
After plaintiff was discharged, he again reported to Dr. LeBlanc and Dr. LeBlanc examined his right leg and he states that his examination revealed normal' motion involving the achilles tendon of the right leg. Patient stated that he was unable to stand on his toes without support .because of the pain involved. The tendon apparently had healed completely. Gastro menus muscle of the right leg is softer than :the left and apparently has some slight atrophy, due to disuse. The doctor was asked what was his opinion as to the recovery of the injury as a result of the injury to the tendon of the right foot and he answered, “I would never have let him return to work if I did not feel he was completely recovered.” The doctor stated that the only symptom that he gave at the time of pain, there was a little depression where the scar is and he said' that was normal and nothing he could do about it — nothing can be done. Dr. LeBlanc was likewise ' asked on page 20 of the transcript,
“Q. Doctor, if there would be a slight lengthening of the tendon for any reason, would you say that would or would not be a contributing factor to pain? A. I don’t know that the lengthening of the tendon would give him any pain. Shortening of the tendon would be more of a contributing factor to pain than lengthening. I would think so because there would be to exercise no counter pull to get a levelling off.
“Q. Did you examine him for pain in the region where the tendon was cut? A. There was no pain on the pododynameter. The pain he complained of was on pushing the toes down against the scar.”
The plaintiff and his • wife claim , that while they were -in Dr. LeBlanc’s office, Dr. LeBlanc stated that the'plaintiff’s foot would hurt as long as he lived. Dr. Le-Blanc denies making such a statement and claims he had no reason to tell him he would suffer the rest of his life.
Plaintiff was likewise examined by Dr. George D. B. Berkett, an orthopedic surgeon of New Orleans, on March 24, 1949, and he made a written report to both plaintiff and defendant which is as follows:
“I examined Mr. Peter Delatte on March 24, 1949 at your request and the following are my findings:
“History: Patient states that on August 7, 1948, while employed as a machinist for Leo Cafiero Inc., he met with an accident. Patient states that while at work, the shavings of an axle cut the tendon on the back of his right ankle. Patient states that he was seen by Dr. LeBlanc and was operated upon by this physician. Patient states, that he returned to work about 10 weeks after the accident and, he states that he was laid off his job.
“Patient’s complaints are entirely refer-rable to his right leg. Patient státes that he cannot walk too great a distance on it because of the fact of a pulling over the tendo Achilles and in the calf of the right leg. Patient states that he is unable to stand for long periods of time because of this condition. Patient’s wife states . that when he walks into a hole, he tends to lose his balance and fall down. Patient also states that he is unable to walk without a limp. Patient states that as long as he is sitting down and does not put his weight on his right lower extremity, he does not have any difficulty with it.
“Physical Examination: Physical examination reveals a well developed; well nourished white male who walks with a right sided limp. It is noted that he tends to avoid the push-off on walking with his right lower extremity. Patient is able to walk on his heels; however, patient states that he is unable to walk on his toes because of the pain. An attempt to stand on both his toes and raise the left lower extremity from the ground causes patient to sink immediately to the ground when weight was borne on his right lower extremity.
*710 “Examination of the right lower extremity reveals approximately an inch (1") atrophy of the right calf,-the circumference on the right measuring 14" as compared with 15%" on the left. There is a full range of motion of both hips and both knees. A scar-1%" long is present just above the tuberosity of the os calcis and runs transversely although somewhat, diagonally with the lateral portion of the scar slightly distal to its medial edge.
“Palpation of the tendo Achilles reveals a normal smooth tendon in the neighborhood of the scar; however, l%"-2" proxi-mally to this scar there appears to be a depression in the tendon. It is not completely disrupted. There appears to be (and this is a subjective test) less resistance to plan-tarflexion on the right than on the left and moreover, there appears to be less contraction of the gastronemius on the right than on the left when this is done. There is no tenderness over the tendo Achilles nor abouf the ankle joint. The peroneal muscles and the posterior tibial mu,scles are powerful and work well, in conjunction with the gastrocnemius.
“The previous test for the strength of the gastrocnemius was done with the -knee' at right angles and the patient in the prone position. With the knee fully- extended, the action of the gastrocnemius appears to be more apparent.
“As patient stands, it is noted that there is no gross disturbance of foot posture. There is a mild valgus of both heels, more so on the left than on the right. With the knee extended, dorsiflexion of the ankle joints is slightly greater on' the right by about 10 degrees than on the left.. With the knee flexed to 90 degrees, the range of dorsiflexion appears to be the same. Plantarflexion is equal bilaterally and on the'right there is a, normal range of sub-astragalar and midtarsal motion. The anterior compartment muscles of the right leg are normal and the pulsations of the posterior tibial and anterior tibial vessels are normal bilaterally.
“Opinion: This 33 year old white male alleges an accident on August 7, 1948 and claims continuing disability because of complaints' deferrable to his right lower extremity.
- “Physical examination reveals slightly over an inch (1") atrophy of' the right calf, and while there is good calf muscle present, it is of necessity weakened due apparently to some lengthening of the tendo Achilles as a result of the accident and subsequent suture. The fullness and slight depression present over the tendo Achilles apparently is the site of suture. There was no evidence of irritation or swelling or redness and it is difficult to explain the patient’s complaints of -pain and even pulling of the calf.
“I am of the opinion that if the patient would attempt to eliminate the limp and try to walk on his toes as much as possible, he might decrease his present -disability.
“I would estimate the patient’s present disability in the neighborhood of about 15% permanent partial disability.”-
Dr. Berkett claims that the nature of his examination consisted of examining the right lower extremity of Mr. Delatte, including observing the patient as he walked and observing any limp that he might have; observing his walk on his heels and observing him as he attempted 'to walk on his toes.
The extremities were measured for any atrophy -by means of a tape measure. The circumference of the thigh and calves'were measured. Both hip joints were examined for any pain or motion and both knees were examined for motion. The area of injury was carefully examined by inspection and palpation. Dr. Berkett explained that inspection is the use of the eyes in describing the condition, and the palpation is the úse of the hands in describing it, meaning using'the hands to feel the area, to move the tissues, the underlying tissues, to feel for any areas of pain or tenderness. Dr. Berkett’s testimony is to the effect that at the time he examined him in March, that this plaintiff had in the neighborhood of 15% permanent partial disability of the right-foot, and he goes on to say in his testimony that in estimating it, “My impression at the time was that there was some lengthening of the tendo Achilles, and I thought that there was at that time a 15% permanent *711 partial disability. I said, too, that the disability might very well decrease, but I would not be able to predict that absolutely. In other words, I felt that, since I could not absolutely predict how much there would be a decrease in disability, I felt that I would rate the man according to my findings at that time.” Dr. Berkett likewise testified with reference to the limp of the plaintiff and he was asked whether or not this limp could be eliminated, and on page 27 of the transcript, he stated as follows:
“Q. Would you say that that limp could be eliminated, sir? A. I thing that it certainly could be markedly improved, sir, and possibly eliminated. I think it is possible to eliminate it.”
The doctor was further asked on page 29 of his testimony,
“Q. What has been, your experience, Doctor, as to the complete or incomplete recovery of this type of case? A. Well, many of the complications that have occurred in some of those cases were not present in Mr. Delatte’s case. For instance, many things that can occur, such as re-rupture of the tendon, irritation of the tendon, which is evidenced by swelling and tenderness and redness over the tendon sheath of the tendo Achilles, and with an early suture, if it is done early, immediately after the accident, .and the patient is treated according to what I consider the correct treatment, the amount of disability is probably practically nil.
“Q. Doctor, did you say that there was a re-breaking of the tendons? A. In some instances, yes.
“Q. In Mr. Delatte’s case? A. No sir, I can only come to the conclusion in Mr. Delatte’s case, on the basis of his history and my findings at that time, — in the history, apparently there was no history of re-rupture of . the tendon. On my physical findings, I saw evidence of some lengthening of the tendon, but no rupture.
“Q. Doctor, you testified that there was a permanent partial disability of 15%, from your examination of Mr. Delatte on March 15, 1949. Could you state, or would you state, what would be your opinion as to his complete recovery in time? A. I think it is very possible. I think it is possible that the recovery would be so complete that, while I might be able to measure some weakness still in the calf muscles, it is perfectly possible that he functionally would have so good a foot that he would not know that he had any disability.
"Q. Well, Doctor, what is your opinion as to his complete recovery in the future? A. I can’t state for certain, sir, without a re-examination of that patient. A re-examination possibly at a later date would give me a much better idea of how much recovery he has made; and that was the reason, sir, that I rated him permanently on the basis of the condition that I found at that time, but stated that I felt that improvement would take place. In other words, out of fairness to the patient, my rating was made on that basis.”
Under the circumstances, nevertheless, Dr. Berkett states that this 15% permanent partial disability is confined to the foot and not a 15% permanent partial disability of the body of the plaintiff.
Now with reference to the pain that the plaintiff complains of, Dr. Berkett was asked the following questions:
“Q. And you said that, at the time you made the examination, there was no swelling or irritation? A. Yes, sir.
“Q. The irritation and the swelling are matters that vacillate considerably; is that not true? A. Not from the primary condition. The irritation, if it were due to a low grade infection or an infection around the suture, might persist for a long time after the operation; but once it has subsided, it probably would not recur. There is no history of an infection here, or any history of any breakdown or discharge of pus, and I assume that did heal completely. I could see no indication for irritation in this region, any more than it would in a normal tendon, for instance, if the irritation had been caused by some mechanical means.
“Q. Swelling and irritation, though, do not necessarily evolve from an infection? A. No, they may come from mechanical irritation.
“Q. And they may also come from strain? A. Probably so, but it is hard to *712 see how a tendon like this would be strained by itself, unless there was a considerable amount of force applied. The pain that this patient complained of was in the calf and not anywhere near the tendon. It was.up in the muscle part of it, and it was very hard to understand why he should have it. If the tendon were shortened and were pulling his calf down, then you could see yrfiere possibly he might have some pain as a result of pulling on the muscle fiber; but this man had the reverse condition, in my opinion; he- had actually a relaxation of the tendon.”
From a close analysis of the testimony of Dr. LeBlanc and Dr. Berkett, we find that the plaintiff in this case did receive an injury as alleged; that the injury has healed and has left only a 15% disability of the right foot, with the possibility of a complete recovery in the near future, on the date of the examination of Dr. Berkett, which was on March 24. This 15% disability was confined to the foot, however, and not disability to the body of the plaintiff and this disability of the foot did not reveal a disability of the plaintiff being unable to perform his occupation as previous to the accident. We do, not think that the plaintiff was suffering from the pain as complained of and. we do not think that this 15% disability to his foot has handicapped him in any way from performing his occupation according to the facts and circumstances as revealed in the evidence.
According to the plaintiff’s own testimony, he has not attempted to secure employment with any one since he has been discharged by the defendant.
A close analysis of the facts of this case leads us to a further conclusion that the reason he was discharged by the defendant on January 3, 1949, is due to insubordination and the argument he had with the general manager on said date when he was making complaint to get more overtime work, and not Because of his injury or 'because of any inability on plaintiff’s rpart to perform his duties. We find this plaintiff doing equally as much and of the same class of work after the accident as prior thereto, and from the evidence as found in the record, we have come to the conclusion that this plaintiff is fully capable of performing the same kind and class of work as he was doing prior to his accident.
This is borne out by the work record of the plaintiff, as found in the record, which evidenced the fact that he was thoroughly able to perform his customary duties. We-.do not find where this plaintiff complained to any of his fellow employees of the pain that he might have been suffering while performing his duty. The only witnesses produced by the plaintiff were he and his wife and a friend, who was a hunting companion.
The lower court found in this case that the plaintiff is completely able to perform the usual duties of his occupation and that on January 3, 1949, he was fired because of insubordination and not because of any reason connected with his injury or because of any inability on plaintiff’s part to perform his duties due to having received the injury on August 7, 1948. It is further the lower court’s opinion that the plaintiff complained that he wasn’t given enough work or that he wasn’t given his proper share of overtime work, which evidenced the fact that he was thoroughly able to perform his customary duties. We believe that the findings of fact made by the lower court are correct in this case and it is a well settled principle of law that the findings of fact made by the lower court should not be disturbed unless manifestly erroneous.
For the above and foregoing reasons, we -believe that the judgment of the lower court is correct and that same is hereby affirmed with costs.